## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SABETTI CONSTRUCTION INC. D/B/A NEWPORT SOLAR, <br>          Plaintiff, <br><br> v. <br><br> SINGLEPOINT INC. <br>          Defendant. | **VERIFIED COMPLAINT** |

## INTRODUCTION

Plaintiff Sabetti Construction Inc. d/b/a Newport Solar brings this action seeking damages against Defendant SinglePoint Inc. for breach of contract, misrepresentation, negligence and violation of the Nevada Deceptive Trade Practices Act arising from Defendant's misrepresentations and failure to close on the sale of Plaintiff's business assets.

## PARTIES

1.     Plaintiff Sabetti Construction Inc. d/b/a Newport Solar ("Sabetti") is a Rhode Island corporation with a principal place of business located at 300 Old Baptist Road, #2, North Kingstown, Rhode Island 02852.

2.     Defendant SinglePoint Inc. ("SinglePoint") is a Nevada corporation with a registered agent located at 701 S Carson Street, Suite 200, Carson City, Nevada 89701 and a principal place of business located at 2999 N 44th Street, Suite 530, Phoenix, Arizona 85018.

## JURISDICTION AND VENUE

3.     The matter in controversy in this case exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.  Plaintiff is incorporated and has its principal place of business in Rhode Island.  Defendant is incorporated and has its principal place of

business in Nevada.  Therefore, this Court has diversity jurisdiction pursuant to 28 U.S.C. §

1332.

4.       Venue is proper in the District Court of Rhode Island pursuant to 28 U.S.C. §

1391(b).

## **FACTUAL BACKGROUND**

### ***The Letter of Intent***

5.       On January 9, 2023, Sabetti entered into a Letter of Intent ("LOI") with

SinglePoint for its purchase of Sabetti's stock for three million dollars ("Transaction").  A true

and accurate copy of the LOI is attached hereto as **Exhibit A**.

6.       Pursuant to Paragraph XII of the LOI, the closing was to take place on May 10,

2023 ("Closing Date").

7.       Pursuant to Paragraph VI of the LOI, SinglePoint represented that it required

financing through a registered public offering, which was "expected to be completed prior to

Closing [Date] of the transaction," or SinglePoint could choose to utilize bridge financing.

8.       Sabetti also agreed to an exclusive negotiating period set forth in Paragraph XIV

of the LOI, which provided, in relevant part, that for a period of 120 days (i.e. the Closing Date)

Sabetti was not entitled to "negotiate with or provide any information to any other parties for the

purposes of investing in [Sabetti], raising capital or related to the purchase and sale of any

interests in [Sabetti] or any assets of [Sabetti]" ("Exclusivity Clause").

9.       In exchange for Sabetti's agreement to the Exclusivity Clause, and in lieu of a

deposit on the Transaction, SinglePoint issued $50,000 of stock to Sabetti.

10.     Following the execution of the LOI, in April of 2023, SinglePoint indicated that it would prefer an asset sale of Sabetti and negotiations commenced in the drafting of an asset purchase agreement ("APA").

### *The Closing Date*

11.     As the Closing Date approached, SinglePoint informed Sabetti that it was unable to close the Transaction on the Closing Date due to challenges with financing, but assured Sabetti that it was working diligently to close the financing gap.

12.     Based on SinglePoint's representation and assurance that it was intent on closing the Transaction, Sabetti continued to negotiate the APA and prepared the necessary documents for closing.

13.     However, as SinglePoint was unable to obtain financing, it proposed an amendment to the LOI, which only modified Section XII of the LOI ("First Amendment").

### *First Amendment to LOI*

14.     The First Amendment modification provided that the parties were aiming for a May 19, 2023 date to sign the APA, but had until June 12, 2023 to complete same.

15.     The First Amendment did not revive or extend the Exclusivity Clause, which lapsed on May 10, 2023.

16.     Following the execution of the First Amendment, SinglePoint continued to make affirmative representations that it was working in good faith towards finalizing (i) the APA, and (ii) the closing documents, to close the transaction as contemplated within the timeframe set by the First Amendment.

17.     Based on SinglePoint's representations, the parties began negotiations for a second amendment to the LOI, which was intended only to extend the Exclusivity Clause.

18.     However, despite the First Amendment, SinglePoint again failed to secure the necessary financing to close on June 12, 2023, but also failed to submit the necessary filings to the SEC for the Transaction.

### *Second Amendment to LOI*

19.     Then, on or about June 22, 2023, SinglePoint circulated a proposed second amendment to the LOI ("Second Amendment").  A true and accurate copy of the Second Amendment is attached hereto as **Exhibit B**.

20.     Pursuant to the Second Amendment, the closing date was amended to July 14, 2023 ("Amended Closing Date").

21.     Additionally, Paragraph V of the Second Amendment provides that "SinglePoint shall pay to [Sabetti] $100,000.00 (the "Break Up Fee") within thirty (30) business days" should SinglePoint fail to close by the Amended Closing Date.

22.     Further, pursuant to Paragraph II of the Second Amendment, the Exclusivity Clause was extended to be contemporaneous with the Amended Closing Date.

23.     Given Sabetti's growing frustration and distrust of SinglePoint, in exchange for Sabetti's execution of the Second Amendment extending the closing date and exclusivity period, pursuant to Paragraph III of the Second Amendment, SinglePoint promised to "issue to [Sabetti] shares of SinglePoint's stock worth $100,000.00 based upon the last closing price of SinglePoint's stock …" within seven (7) days of execution of the Second Amendment, *i.e.* by June 29, 2023.

24.     Further, the Second Amendment provided that if SinglePoint "fails to issue the stock [by June 29, 2023] … [Sabetti] shall have the option to terminate the LOI at which time

this Second Amendment shall be void except for SinglePoint's obligations to pay the Break Up

Fee…"

25.     Reluctantly, Sabetti executed the Second Amendment on June 22, 2023.

### *SinglePoint's Failure to Issue Stock in Accordance with Second Amendment*

26.     Despite its promise to issue $100,000.00 worth of stock to Sabetti within seven

(7) days of executing the Second Amendment, SinglePoint failed to do so by June 29, 2023.

27.     SinglePoint's promise was mere lip service as it was restricted from issuing stock,

while its SEC filing was pending.

28.     As a result of its failure to issue the $100,000.00 worth of stock by June 29, 2023,

the Second Amendment was rendered void, except for SinglePoint's obligation to pay the Break

Up Fee.

29.     Sabetti made repeated requests for SinglePoint to issue the promised stock, but

SinglePoint simply failed to do so.

30.     However, on August 4, 2023, SinglePoint issued some stock to Sabetti, which

failed to monetize and is worthless.

### *SinglePoint's Failure to Close by the Amended Closing Date*

31.     Following the execution of the Second Amendment, SinglePoint repeatedly

contacted Sabetti providing excuses for its failure (i) to complete its filings with the SEC, (ii) to

raise money through existing investors, and (iii) secure financing to close on the Transaction.

32.     In response to Sabetti's request for reassurance from SinglePoint as to its ability

to close the Transaction, SinglePoint represented that it was receiving "final approval" from a

bank on July 6 and that it was close to raising $1 million to help close the Transaction.

33.     However, on July 10, 2023, SinglePoint informed Sabetti that it was not going to be able to close on the Amended Closing Date.

34.     Then, on July 13, 2023, SinglePoint advised Sabetti that it "did not know" when it would be able to obtain financing to close the Transaction.

35.     The Transaction did not close on the Amended Closing Date and there was no extension of the closing date or the exclusivity period.

36.     Additionally, despite its agreement to close on the Amended Closing Date, SinglePoint failed to do so.

37.     Further, despite the explicit requirement to pay Sabetti the Break Up Fee within thirty (30) business days of the Amended Closing Date, if it failed to close, SinglePoint failed to do so.

### *Post Amended Closing Date*

38.     Despite its breach of the Second Amendment, and without any further extension or amendment, the day after the Amended Closing Date, on July 14, 2023, SinglePoint again represented to Sabetti that it was "confident" in its ability to obtain funding to close by August 4, 2023.

39.     Sabetti did not agree to a further closing date of August 4, 2023.

40.     On August 4, 2023, SinglePoint contacted Sabetti claiming it was expecting to receive the necessary funding to close that day, but it never received said funding.

41.     The Transaction did not close on August 4, 2023.

42.     On August 25, 2023, Sabetti issued a demand letter, pursuant to NRS c. 598, to SinglePoint ("Demand").

43.     In response, on August 28, 2023, SinglePoint rejected Sabetti's Demand.

## COUNT I – Breach of Contract

44.    Plaintiff repeats and realleges each of its allegations as set forth above as if fully set forth herein.

45.    Plaintiff and Defendant entered into an enforceable contract as memorialized in the Second Amendment.

46.    Defendant breached its contract with Plaintiff by, amongst other transgressions, failing to (i) close the Transaction on the Amended Closing Date, (ii) pay the Break Up Fee, and (iii) issue $100,000.00 worth of stock to Sabetti.

47.    At all relevant times, Plaintiff was in full compliance with the terms of the Second Amendment.

48.    The aforementioned breaches of contract have directly resulted in harm to Plaintiff.

49.    Plaintiff now seeks to recover damages for these breaches of contract in an amount to be determined at trial.

## COUNT II – Breach of Implied Covenant of Good Faith and Fair Dealing

50.    Plaintiff repeats and realleges each of its allegations as set forth above as if fully set forth herein.

51.    Under Nevada law, every contract includes an implied covenant of good faith and fair dealing requiring that (i) SinglePoint not do anything to jeopardize Sabetti's expectations and benefits owed under the contract, (ii) SinglePoint to deal fairly and in good faith with Sabetti, and (iii) Singlepoint to promptly and fairly carry out its obligations.

52.    The contract between Plaintiff and Defendant is governed by Nevada law.

53.    Defendant's refusal to honor the terms of the contract with Plaintiff by, amongst

other transgressions, failing to (i) close the Transaction on the Amended Closing Date, (ii) pay the Break Up Fee, and (iii) issue $100,000.00 worth of stock to Sabetti, and (iv) deliberately engaging in actions purposefully aimed at frustrating and interfering with Sabetti's ability to benefit from the contract.

54.     Defendant has, therefore, breached the implied covenant of good faith and fair dealing contained as part-and-parcel of its contract with Plaintiff.

55.     The Defendant is guilty of oppression, fraud and/or malice.

56.     As a result of Defendant's breach, Plaintiff has been harmed.

57.     Plaintiff now seeks to recover damages for these breaches of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

### COUNT III – Misrepresentation

58.     Plaintiff repeats and realleges each of its allegations as set forth above as if fully set forth herein.

59.     SinglePoint made a number of misrepresentations, including but not limited to its ability to secure financing, and its promise to issue $100,000.00 worth of stock, intended to reassure and convince Sabetti that it had the ability to close on the Transaction, while securing an extension of the exclusivity clause.

60.     Sabetti relied on these representations in deciding to execute the Second Amendment.

61.     SinglePoint, however, knew that these statements and representations to Sabetti were false when they were made, *i.e.* promising to issue $100,000.00 worth of stock to Sabetti, but yet SinglePoint was restricted from issuing stock while its filing was pending with the SEC.

62.     SinglePoint made such misrepresentations knowing that Sabetti would have refused

to execute the Second Amendment had the truth been known to it.

63.     SinglePoint never intended to act in the manner in which it represented to Sabetti.

64.     Sabetti reasonably and justifiably relied on SinglePoint's representations in agreeing to execute the Second Amendment.

65.     SinglePoint's knowing, willful and intentional misconduct has directly and proximately caused Sabetti actual and compensatory damages in an amount to be determined at trial.

## COUNT IV – Negligence

66.     Plaintiff repeats and realleges each of its allegations as set forth above as if fully set forth herein.

67.     SinglePoint owed a duty to Sabetti to act in a reasonably, truthfully and competently in its dealings with Sabetti to close on the Transaction.

68.     SinglePoint breached its duties to Sabetti by, *inter alia*, repeatedly making misrepresentations to Sabetti regarding its ability to close on the transaction and to issue stock to Sabetti, and failing to close on the Transaction.

69.     As a direct and proximate result of the foregoing, Sabetti has suffered, and continues to suffer, damages, including but not limited to deprivation of Break Up Fee and the issuance of the $100,000.00 worth of stock.

## COUNT V – Violation of the Nevada Deceptive Trade Practices Act, N.R.S. §598.092

70.     Plaintiff repeats and realleges each of its allegations as set forth above as if fully set forth herein.

71.     In its dealings with Sabetti, SinglePoint undertook certain deceptive acts or practices, including but not limited to representing that it (i) had the ability to secure financing to

close on the Transaction, and (ii) could issue $100,000.00 worth of stock to Sabetti, in order to coerce Sabetti and secure repeated extensions of the closing date and the exclusivity clause for more than eight (8) months.

72.     Sabetti reasonably relied on SinglePoints' representations in entering into the Second Amendment.

73.     It was reasonable and justifiable for Sabetti to rely on SinglePoint's representations.

74.     Had Sabetti known the true facts which were concealed by SinglePoint, it would not have entered into any agreements with SinglePoint, including but not limited to the Second Amendment.

75.     Sabetti was damaged by its reliance on SinglePoint's false misrepresentations of fact and deceptive trade practices.

76.     As a direct and proximate result of SinglePoint's deceptive acts or practices, Sabetti has suffered damages in amount to be determined at trial.

## **PRAYERS FOR RELIEF**

WHEREFORE, the Plaintiff Sabetti Construction Inc. d/b/a Newport Solar prays that this Honorable Court award it the following relief:

A.  Enter judgment for Plaintiff against Defendant on Counts I-IV set forth herein and award Plaintiff actual,compensatory and punitive damages against Defendant in an amount to be determined at trial;

B.  Enter judgment for Plaintiff against Defendant on Count V of the Complaint for its deceptive acts or practices  in violation of N.R.S. §598.092, and award Plaintiff damages in an amount to be determined at trial, plus attorney's fees, costs, and double or treble damages;

C.  Award Plaintiff attorney fees and costs, as recoverable under Nevada law;

D.  Award Plaintiff pre-judgment and post-judgment interest; and

E.  Award Plaintiff such other and further relief as this Honorable Court deems just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

PLAINTIFF,

**SABETTI CONSTRUCTION INC. d/b/a NEWPORT SOLAR,**

By its attorneys,

/s/ Hillary J. Garland
Hillary J. Garland, Esq. # 7520
Tang & Maravelis, P.C.
200 Tollgate Road, Suite 203
Warwick, RI 02886
(401) 384-7265
hgarland@tangmaravelis.com

Dated: November 10, 2023

## <u>VERIFICATION</u>

I, Douglas Sabetti, hold the position of ___President___ with the Plaintiff Sabetti Construction, Inc. d/b/a Newport Solar in the above-captioned matter. In that position, I hereby verify and attest under the penalties of perjury on behalf of the Plaintiff that I have read the foregoing Verified Complaint and know to the best of my current information the contents thereof; and that the facts set forth in the Verified Complaint are based on my own personal knowledge or a review of available records, and are true to the best of my knowledge, except as to those facts that are alleged upon information and belief, which I am informed and believe to be true.

Douglas Sabetti
_____

Print Name:

# <u>EXHIBIT A</u>



2999 N 44th St, Suite 530
Phoenix, AZ 85018

<u>C</u>ONFIDENTIAL

January 9, 2023

Mr. Doug Sabetti
Founder & Chief Executive Officer
Sabetti Construction Inc.
300 Old Baptist Road #2
North Kingstown, RI 02852

Subject: Non-Binding Letter of Intent

Dear Doug,

We are pleased to present to you and your firm BayState Business Brokers (the "Advisor"), acting on behalf of Sabetti Construction Inc, D/B/A Newport Solar (the "Company" or the "Seller"), with this non-binding Letter of Intent ("LOI") for consideration by you and the Company's owners. SinglePoint Inc., ("SinglePoint" or the "Buyer"), is submitting this letter of intent to express its interest in consummating an acquisition of the Company as described in more detail herein (the "Transaction").

The obligation of the parties hereto to consummate the Transaction are subject to the negotiation and execution of the Definitive Purchase Agreement. Accordingly, this letter is intended solely as a basis for further discussion and is not intended to be and does not constitute a legally binding agreement. This letter shall not confer on any person or entity, other than the parties hereto, any rights or remedies.

I.      **P**URCHASE **P**RICE & **T**RANSACTION **S**TRUCTURE**.** The purchase price for one hundred percent (100%) of the outstanding capital stock, on a cash-free and debt-free basis, of three million dollars ($3,000,000) (the "Purchase Price"). At closing (the "Closing"), subject to the satisfaction of all conditions precedent contained in the Definitive Purchase Agreement, the Buyer will purchase the capital stock from the Seller, including warrants, options, and convertible securities of the Seller (as described in more detail below in "Form of Consideration" section), free and clear of any liens, charges restrictions or encumbrances (collectively, the "Shares") or all the assets of the Company (the "Assets") with the final determination to be agreed to upon the Buyer and Seller. The Buyer will pay, at Closing, two million five hundred thousand dollars ($2,500,000) paid in cash at Closing and five hundred thousand dollars ($500,000) subject to the terms outlined in the "Escrow/ Holdback" section below.

The Buyer may assign some or all of its rights hereunder prior to the Closing to one or more of its subsidiaries. Pursuant to further due diligence the Buyer may elect to treat the acquisition as an asset purchase or may elect that the Transaction be treated as an "Asset Sale" under Section 338(h)(10), or substantial equivalent, under the IRS tax code.

II.      **R**ESTRICTED **S**TOCK **U**NITS**.** The RSU Plan will be mutually developed, agreed upon, and implemented with input from the Buyer and Seller based on identified and selected employees': (i) historical and total compensation; (ii) duration of employment; (iii) critical role in contributing to the Company's long-term goals; and (iv) desired duration of retention with a minimum vesting schedule of three years.

III.      **N**ET **W**ORKING **C**APITAL**.** As part of the working capital needs, the Seller will convey a mutually agreeable net working capital target ("Base Amount") with a formula to be defined during diligence (i.e., current assets, excluding cash, minus current liabilities) of the Seller ("Net Working Capital"). To the extent that there is a difference between the Base Amount and the Net Working Capital at Closing, the purchase price will be increased or decreased dollar-for-dollar over or below the Base Amount.

CONFIDENTIAL
Mr. Doug Sabetti
Sabetti Construction Inc.
January 9, 2023

IV.     **ESCROW / HOLDBACK.**  The Buyer will pay five hundred thousand dollars ($500,000) no later than six (6) months from the Closing of the Transaction subject to any post-closing adjustments resulting from the completion of the audited financial statement plus or minus any adjustments related to Net Working Capital.  The Buyer will purchase Representation and Warranty Insurance at its sole cost and expense pursuant to terms to be agreed upon in Definitive Purchase Agreement.  For the avoidance of doubt, this excludes compensation from management transition or consulting contracts and incentive shares, such as Restricted Stock Units ("RSUs"), issued to employees of Newport Solar.

V.      **EMPLOYMENT MATTERS.**  At Closing, key owners and consultants will enter into a consulting agreement to be mutually agreed upon by each party. Doug Sabetti, Sue McNally, and Forrest Gibson will each enter into a consulting agreement, under mutually agreeable terms, with the Buyer for one year with a sunset provision to be agreed upon.

VI.     **FINANCING.**  The Transaction will require a financing through a registered public offering that is expected to be completed prior to Closing of the Transaction.  The registered public offering will be subject to the filing of a Form S-1 or S-3 and approval by the Securities & Exchange Commission and will be executed as an underwritten offering by a designated broker-dealer.  SinglePoint anticipates that the offering amount will be no less than US$4.0 million with the exact amount determined by the Buyer's acquisition pipeline, underwriter commitments and market conditions at the time of the issuance.  At the sole discretion of the Buyer, the Buyer may choose to utilize a bridge financing in order to complete the Transaction.

VII.    **PURCHASING ENTITY.**  SinglePoint Inc., (OTC:SING), a Nevada corporation, is a US publicly listed company founded over fifteen years ago, focused on providing renewable energy solutions and energy-efficient applications to drive better health and living.  The company's core subsidiaries include solar and air purification and has built a portfolio through synergistic acquisitions, products, and partnerships to provide a diversified holding base. The Company's primary focus today is on solar and renewable energy where it is committed to building a foundation for future expansion opportunities.  The company's acquisition and portfolio strategy objective is to create long-term value for shareholders by helping its partner companies increase market penetration, grow revenue and improve cash flow.

For purpose of the Transaction, the Buyer intends to utilize the Seller's existing business, management, and operations as the accelerant for rapid national growth.  The Purchasing Entity will be SinglePoint or an entity established by SinglePoint.

VIII.   **BOARD AND/OR INVESTMENT COMMITTEE REVIEW.**  The Transaction decision is subject to approval by SinglePoint's Chairman, Chief Executive Officer, and Chief Financial Officer and is not subject to full board approval or shareholder approval.

IX.     **REQUIRED APPROVALS AND CONDITIONS.**  This offer is expressly contingent upon completion of the following:

a.   Completion of due diligence by the Buyer and its advisors within sixty (60) days of signing of a letter of intent, the results of which are satisfactory to the Buyer in its sole and absolute discretion. Diligence will include verification to the satisfaction of the Buyer that existing contracts, leases, and licenses, if any, are assignable, assumable, transferable, or renegotiable on satisfactory terms.

b.   Completion of Quality of Earnings report within the sixty (60) day diligence period and formal written notice from the Buyer of its intent to move forward with the Transaction under the terms outlined herein.

c.   The Buyer's determination to elect for the Transaction be treated as an "Asset Sale" under Section 338(h)(10), or substantial equivalent, under the IRS tax code.

    d.    The delivery of a draft Definitive Purchase Agreement within 90 days of the signing of a letter of intent, based upon the framework described in this Letter of Intent with comprehensive representations, warranties, indemnifications and other terms appropriate to the transaction, with execution of a final Definitive Purchase Agreement within 120 days of signing of letter of intent.

    e.    The completion of mutually acceptable employment agreements or consulting agreements for senior management team.

    f.    Obtaining of financing acceptable to Buyer within ninety (90) days of execution of this Letter of Intent and closing within one hundred twenty (120) days after execution of this Letter of Intent.

X.    **COVENANT NOT TO COMPETE OR SOLICIT.** Seller will be bound by a Covenant not to compete and covenant not to solicit in which will be included in the Purchase Agreement and in any employment or consulting agreement for a period of five (5) years following the later of the closing of the transaction or the termination of any employment or consulting agreement for cause.

XI.    **OPERATIONS PENDING CLOSE.** Until the Closing, the Seller shall continue to operate the business in a reasonable manner consistent with past practices, shall not engage in any transaction outside of the ordinary course of business without the Buyer's consent, which consent shall not be unreasonably withheld, conditioned, or delayed, and shall have achieved mutually acceptable financial performance. All equipment used by the Seller shall be conveyed at time of closing.

XII.    **CLOSING.** During due diligence, the Buyer will prepare the Definitive Purchase Agreement and any related agreements, and the parties shall use their best efforts to execute the Purchase Agreement and any related agreements as promptly as possible, but in no event later than May 10, 2023 unless mutually agreed upon by both Parties.

XIII.    **EXPENSES OF THE PARTIES.** Each party will be responsible for and pay its own legal and other costs in connection with this Transaction.

XIV.    **EXCLUSIVE NEGOTIATING PERIOD.** For a period of one hundred twenty *(120)* days following the execution of this Letter of Intent, the Seller shall not negotiate with or provide any information to any other parties for the purposes of investing in the Company, raising capital or related to the purchase and sale of any interests in the Company or any assets of the Company. In the event that any third parties contact the Company or Seller related to any of the foregoing, the Seller will promptly notify SinglePoint and provide details of such communications. Upon signing of the Letter of Intent the Buyer will issue the Seller fifty thousand dollars ($50,000) of its shares based upon the sixty (60) days volume weighted average price of SING prior to execution of the LOI In the event the Seller chooses not to consummate the Transaction, the Buyer will have the right to claw back seventy-five percent of the shares that have been issued for no additional consideration.

XV.    **CONFIDENTIAL INFORMATION.** The parties agree that neither will use or disclose any of the information gathered pursuant to the non-disclosure agreement executed on November 21, 2022 (the "NDA"), except for the purposes of pursuing the transaction contemplated by this Letter of Intent. As stated in the NDA, without the express written consent of all the parties hereto, each of the parties hereto agree to maintain in confidence and not disclose to any other person the existence of this Letter of Intent, the terms of the proposed transaction or the information delivered in connection with the proposed due diligence, other than disclosures required to obtain the approvals for the transaction contemplated hereby, disclosures to those professionals, advisors and potential financing sources and their attorneys who have a need to know, any other disclosure required by applicable law or to inform third parties of the existence of the Letter of Intent and its exclusivity provisions. In the event that a party hereto is subject to a request (by oral questions, interrogatories, request for information or documents, subpoena or similar process) to disclose any

**CONFIDENTIAL**
Mr. Doug Sabetti
Sabetti Construction Inc.
January 9, 2023

       information supplied to it in connection with this transaction to anyone other than professionals, advisors and potential financing sources and their attorneys, such party agrees to provide the other parties prompt notice of such request so that an appropriate protective order may be sought and/or such other parties may waive the first party's compliance with the terms of this paragraph.

XVI.     **GOVERNING LAW.** This Letter of Intent will be governed by and construed in accordance with the laws of the State of Nevada, without giving effect to any conflict of law provision and to the exclusion of the laws of every other jurisdiction.

This letter is non-binding with the exception of Paragraphs XIII *(Expenses of the Parties)* and XIV Exclusive (*Negotiating Period*) and XV *(Confidential Information)* and XVI *("Governing Law"),* which are binding and governed by the laws of Nevada.

If you agree to these terms, please promptly sign the original of this letter as indicated below and return it by January  13, 2023, after which time it shall be null and void.

*[signature page to follow]*

<u>**CONFIDENTIAL**</u>
Mr. Doug Sabetti
Sabetti Construction Inc.
January 9, 2023

**SINGLEPOINT INC.:**

By: *Wil Ralston*
William Ralston
Chief Executive Officer
Date: January 9, 2023

**AGREED AND ACCEPTED BY:**

By: _____
Doug Sabetti
Founder & Chief Executive Officer
Date: January  9 , 2023

# **EXHIBIT B**

## Second Amendment to
## Letter of Intent

This Second Amendment to Letter of Intent (the "Second Amendment") is entered into as of June 22, 2023 (the "Effective Date").

WHEREAS, SinglePoint Inc., a Nevada corporation ("SinglePoint") and Sabetti Construction Inc. (d/b/a Newport Solar), a Rhode Island corporation ("Newport") (SinglePoint and Newport, together, the "Parties") entered into a Letter of Intent dated January 9, 2023 (the "LOI"), as amended by that certain First Amendment to Letter of Intent dated as of May 10, 2023, that, except with respect to certain provisions, was non-binding, for SinglePoint to purchase either the stock or assets of Newport for total consideration of $3,000,000.00 (the "Transaction");

WHEREAS, the Parties have been negotiating in good faith to finalize an Asset Purchase Agreement (the "Purchase Agreement") and close the Transaction;

WHEREAS, the Parties anticipate an amended closing date of July 14, 2023 (the "Closing Date");

NOW THEREFORE, for good and valuation consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties wish to enter into this Amended LOI and agree as follows:

I.  **CLOSING.**  The Parties will execute the Purchase Agreement and all other ancillary documents necessary to close the Transaction and will close the Transaction on or before the Closing Date, unless mutually agreed upon by both Parties.

II.  **EXCLUSIVE NEGOTIATING PERIOD.**  The Parties agree that the exclusive negotiating period set forth in paragraph XIV of the LOI is hereby extended until the Closing Date.

III.  **ADDITIONAL CONSIDERATION**.  In consideration for Newport's agreement to further extend the exclusive negotiating period, SinglePoint will issue to Newport shares of SinglePoint's stock worth $100,000.00 based upon the last closing price of SinglePoint's stock prior to the Effective Date, which will be issued to Newport as soon as commercially reasonable but in no event later than seven (7) days following the Effective Date. In the event that SinglePoint fails to issue the stock within seven (7) days of the Effective Date, Newport shall have the option to terminate the LOI at which time this Second Amendment shall be void except for SinglePoint's obligations to pay the Break Up Fee set forth in paragraph V.

IV.  **WAIVER OF CLAWBACK RIGHT**.  SinglePoint shall, and hereby does, waive its right to claw back any shares of SinglePoint's stock issued to Newport pursuant to paragraph III hereof and paragraph XIV in the LOI.

V.  **REMEDY FOR FAILURE TO CLOSE.**  Unless caused by Newport's failure or refusal to close the Transaction by the Closing Date, in the event that SinglePoint does not close the Transaction by the Closing Date, SinglePoint shall pay to Newport $100,000.00 (the "Break Up Fee") within thirty (30) business days, which shall be Newport's sole and exclusive

DocuSign Envelope ID: 5942FADB-079B-4673-981C-B51A3E675B4A

remedy for any failure to close the Transaction.

VI.  **<u>BINDING PROVISIONS</u>**.  The Parties agree that the provisions of this Second Amendment are binding upon the parties.

VII.    **<u>SUPERSEDING AMENDMENT.</u>**  This Amended LOI shall bind the Parties hereto and supersede the LOI, except where explicitly stated.  Except as amended hereby, the LOI shall remain in full force and effect and shall not be otherwise amended except as set forth herein.

[*<u>Signature Page to Follow</u>*]

DocuSign Envelope ID: 5942FADB-079B-4673-981C-B51A3E675B4A

Agreed and accepted as of this 22nd day of June, 2023.

**SINGLEPOINT INC.:**

**By:** _Wil Ralston_

Mr. Wil Ralston
Chairman & Chief Executive Officer

**SABETTI CONSTRUCTION INC.:**

**By:** _DocuSigned by:_
_BF453EE5E1684BE..._

Mr. Doug Sabetti
Founder & Chief Executive Officer