# EXHIBIT F



|  | **Jeremy Y. Weltman, Esq.** |
|---|---|
| Direct: | 617.570.3556 |
| E-mail: | jyw@riw.com |

August 25, 2023

**VIA CERITIFIED MAIL (RETURN RECEIPT REQUESTED) & EMAIL**

Single Point, Inc.
Wil Ralston, CEO
2999 N. 44th Street
Phoenix, AZ 85018
wilr@singlepoint.com

Re: **Demand Letter Regarding LOI for Purchase of Stock in Sabetti Construction, Inc. d/b/a Newport Solar**

Dear Sir:

This firm has been retained by Sabetti Construction, Inc. ("Sabetti") in connection with enforcing the obligations of Single Point, Inc. ("Single Point") with respect to a certain Letter of Intent ("LOI") for the stock purchase of Sabetti Construction, Inc. d/b/a Newport Solar entered into by Single Point and Sabetti on January 9, 2023. Take note that *this letter is a pre-suit demand under Chapter 598 of the Nevada Revised Statutes, also known as the Nevada Deceptive Trade Practices Act ("NDTPA")*.

**Background**

As Single Point is no doubt aware, on January 9, 2023, Sabetti entered into a LOI with Single Point which outlined the terms of the purchase of the stock of Sabetti by Single Point. The LOI stated that the transaction would require financing through a public offering or, at the buyer's option, the buyer could choose to use bridge financing.

The LOI also contained an exclusive negotiating period ("exclusivity") which was 120 days from the execution of the LOI, or May 10, 2023. In exchange for the exclusivity and in lieu

Single Point, Inc.
August 25, 2023
Page 2 of 7

of a deposit, Single Point issued $50,000 of stock to Doug Sabetti. While the LOI was largely non-binding, the provision related to the exclusivity and the grant of the stock was expressly stated to be binding on the parties.

At some point in the next couple of months, Single Point indicated that it would prefer an asset sale of Sabetti and negotiations commenced in the drafting of an asset purchase agreement in April 2023 (the "APA"). Since the exclusivity was to expire on May 10, 2023, the purchase agreement stated that the closing was to be no later than May 10. As the May 10 date approached, it became clear that Single Point would not be able to close; however; Single Point affirmatively represented that its failure to close was due solely to challenges in financing at this point, but it assured Sabetti of its continued desire to close the financing gap. Based on such representations and assurances, Sabetti and his counsel continued to work on finalizing the APA and pulling together all necessary documents to close. Indeed, at the point in time of Single Point's representations and assurances concerning its continued desire to close the transaction, Sabetti and his counsel did not see any reason to not extend (yet again) the date by which the parties were to close the transaction.

During discussions about Single Point needing another extension of time in which to obtain proper financing and close the transaction, Single Point proposed an "amendment" to the LOI which only modified Section XII thereto (which dealt with the Closing). This amendment provided that the parties were aiming for May 19 to sign the APA but, ultimately, had until June 12, 2023 to do so. Notably, there was no mention of extending the exclusivity.

Thereafter, Single Point continued in making affirmative representations to counsel for Sabetti that it was working in good faith towards finalizing the APA and other necessary documents (e.g. consulting agreements for certain key players of Sabetti) to close the transaction

Single Point, Inc.
August 25, 2023
Page 3 of 7

as contemplated in the LOI (and amendment thereto). Based on such representations, the parties began working on a second amendment to the LOI, the purpose of which was to extend the exclusivity provision found in the original LOI. Disappointingly, only as the June 12, 2023 extension deadline for the closing drew nearer, Sabetti learned that even though making representations otherwise, Single Point had not only failed to secure necessary financing, but also failed to submit necessary filings to the SEC for the would-be transaction – calling into question its true motive behind what was starting to appear as a charade being perpetrated by Single Point.

Sabetti and its counsel did not receive a proposed second amendment to the LOI until after the June 12, 2023 extended deadline the parties agreed to in the first amendment. Presumably sensing Sabetti's growing discomfort with consummating the transaction given Single Point's behavior outlined above, it was at this point that Single Point offered/promised Sabetti an additional $100,000 worth of Single Point stock as an inducement to extend the exclusive negotiating period and keep Sabetti at the table ("inducement stock").

In agreeing to the terms of the second amendment to the LOI, the inducement stock was supposed to be issued within seven (7) days of its June 22, 2203 execution. This promise was not fulfilled. Single Point also agreed to a new extended closing date of July 14, 2023. This promise was not fulfilled. Single Point also agreed in the second amendment to the LOI that in the event Single Point failed to close the transaction by the new July 14, 2023 extended closing break, it would pay to Sabetti a $100,000 "Break Up Fee" within thirty (30) business days. As of the date of this Demand Letter, this promise was not fulfilled.[1]

---

[1] The second amendment to the LOI also waived Single Point's right to any claw back of shares issued to Sabetti.

Single Point, Inc.
August 25, 2023
Page 4 of 7

The ensuing three (3) weeks after the second amendment to the LOI was signed was filled with calls and emails where Single Point continued to make excuses about why its SEC filing was not done, why it could not raise any more money through their existing investors and why its financing was not yet secured. In retrospect, it is now clear that Single Point never intended to actually consummate the transaction contemplated by the LOI with Sabetti and, instead, used unfair and deceptive practices to leverage its dealings with Sabetti to its sole benefit without ever fulfilling its agreed-to obligations under the LOI.  Highlights of such behavior include:

- Single Point represented to Sabetti that it was "confident" in it ability to finance the transaction and planned to pursue two options for financing: a loan with the bank and raising capital through a stock offering. The bank had apparently asked for a personal guaranty from one of the board members, but when the board member was evaluated by the bank in this regard, he was rejected on account of a lack of being creditworthy.

- Immediately after the July 4th weekend, Sabetti sought reassurance from Single Point that it was going to be able to close. Notwithstanding the lack of creditworthiness determination by the bank as noted above, Single Point (mis)represented on July 5 that it was getting "final approval" from the bank on July 6 and that it was very close to raising $1 million to help close the transaction.

- It was not until July 10 that Single Point informed Sabetti that it was not going to be able to close by the last extended deadline of July 14. In a July 13 phone call, Single Point was obviously evasive and could only say that it "did not know" when it would obtain funding. No request for another extension was made by

Single Point, Inc.
August 25, 2023
Page 5 of 7

Single Point. The next day, on July 14, Single Point affirmatively represented (again) that it was "confident" in its ability to obtain funding in time to close by August 4, 2023. Of note, Sabetti did not extend the exclusivity which lapsed on July 14 and triggered the agreed-upon Break Up Fee provision from the second amendment to the LOI.

- On August 4, 2023, Single Point reached out to Sabetti for the last time, claiming it expected to receive the necessary funding that day. Unfortunately, the funding never came through and Sabetti never heard back from Single Point thereafter.

- With respect to the promised payment to Sabetti of $100,000 of Single Point stock by June 29, 2023 that was agreed-to by Single Point as part of the second amendment to the LOI in exchange for Sabetti's agreement to further extend exclusivity to July 14, Single Point simply failed to make the payment. When counsel for Sabetti inquired as to the same, Sabetti received unsigned documents and some transfer instructions but nothing that stated that the stock had actually been issued. Sabetti has since learned that Single Point made the promise of the inducement stock even though it was restricted from issuing the stock while its SEC filing was pending. Once finalized, and after another request by Sabetti, *some* of the stock was finally issued on August 4, 2023. Indeed, upon closer inspection of the stock price and an apparent 1:400 stock split (causing the value of each share to drop by approximately 62% overnight) that had occurred between when the stock was supposed to be issued to Sabetti (June 29) and when it was actually issued to Sabetti (August 4), it became apparent that the inducement stock issuance that was promised by Single Point as part of the

Single Point, Inc.
August 25, 2023
Page 6 of 7

second amendment to the LOI is just another failure in a growing list of promises made by Single Point that it has failed to fulfill, since the stock that it purportedly did eventually transfer to Sabetti does not actually total $100,000 in value.

**Summary of Claims**

Based on the above facts, Single Point's empty promises and intentional misrepresentations made to induce Sabetti into entering into and repeatedly extending an LOI giving Single Point exclusivity to purchase its assets for some eight (8) months amount to unfair and deceptive trade practices in violation of Chapter 598 of the Nevada Revised Statutes. Similarly, Single Point's refusal to timely pay the Break-Up Fee and Inducement Stock, even in the face of repeated requests for the same by Sabetti also constitute unfair and deceptive trade practices, breach of the LOI, misrepresentation and negligence. As a direct result, Sabetti has been significantly damaged, not to mention the forced incursion of over $40,000 in unnecessary legal fees attributable to the underlying charade of a transaction described above.

**I am obliged to inform you that a violation of NRS c. 598 subjects Single Point to potential multiple damages and attorneys' fees.**

The purpose of this letter is to make one last good faith attempt to settle this matter in advance of litigation and to serve as formal notice that Sabetti intends to aggressively pursue its rights to the fullest extent afforded by Nevada law. To this end, I am authorized for settlement purposes only to demand payment by Single Point to Sabetti for the claims outlined herein in the amount of $255,000.00. This demand remains valid for 14 days from the date of this letter and only increases should the need for formal litigation prove self-evident.

Should you wish to discuss this matter further, I am available by phone at the telephone number provided at the top of this letter. However, given the already undue delay exhibited by

Single Point, Inc.
August 25, 2023
Page 7 of 7

Single Point as outlined herein, in the event that I do not hear from you within 14 days from this demand letter, my client will immediately proceed with filing suit against Single Point consistent with the causes of action enumerated herein, pursuing the same with utmost ferocity.

    In the meantime, Single Point reserves all rights and waives none.

                                            Very truly yours,

                                            Jeremy Y. Weltman

cc:    Client (by email)
        Attorney Eric Sigman (by email)